## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

<table>
<tr><td>

ETS MIR LLC, a South Dakota limited
    liability company, a/k/a
    Etablessement MIR,

      Plaintiff,

v.

PETROCI HOLDING COTE D'IVOIRE,
a/k/a NATIONAL OIL COMPANY OF
COTE D'IVOIRE and VAMISSA BAMBA,
individually,

      Defendants.

</td><td>

**CIVIL ACTION No.  1:22-cv-10228 (JPO)**

**SECOND AMENDED COMPLAINT AND
JURY DEMAND**

</td></tr>
</table>

Plaintiff  ETS MIR LLC, a South Dakota limited liability company also known as

Etablessement MIR ("ETS MIR"), by way of its Second Amended Complaint, alleges as follows:

### NATURE OF THE ACTION

1.　　This action arises from Defendant PETROCI HOLDING COTE D'IVOIRE's

("Petroci") unilateral, wrongful and unlawful purported termination of two agreements, defined

below as Agreements One and Two, between the parties, based upon a pretext of unsupported

claims of "irregular tax situation." That false statement not only formed the alleged basis for the

wrongful termination of contract, but have been understood to have been made to non-parties by

Petroci and its director general, Vamissa Bamba ("Bamba"). ETS MIR seeks to reinstate and

enforce the agreements and, alternatively, to recover damages for breach of these two

agreements, as well as recover damages for defamation and trade libel.

**PARTIES**

2.       ETS MIR was formed as a limited liability company in the State of South Dakota

on or about January 12, 2022 with Business ID # Dl218335, with a current address at 2098

Gaither Road, Suite 200, Rockville, Maryland 20850. Its sole member is Biamary Coulibaly, a

citizen and resident of Cote d'Ivoire ("Coulibaly").

3.       ETS is an abbreviation for Etablissement, the French word for Establishment.

ETS MIR LLC therefore is also known as Etablissement MIR, referring to the United States

company.

4.       However, ETS MIR, formed and located in the United States, is separate and

legally distinct from a company known as Etablissement MIR, which is located at 01 BP 16

Abidjan, Cocody 2 Plateaux in Cote d'Ivoire. This latter Ivoirian company was formed under the

law of Cote d'Ivoire and registered in Cote d'Ivoire on June 21, 2018 as a société à responsibilité

limitée (SARL), essentially a private limited liability company. There are three shareholders of

this Ivoirian company, of which Biamary Coulibaly is one. It is registered in Code d'Ivoire under

the name of Mr. Kone Moussa. It is referred to hereafter as "Etablissement MIR SARL."

5.       Therefore, ETS MIR and Etablissement MIR SARL are separate legal entities,

and Etablissement MIR SARL is not a party to or otherwise involved in this lawsuit.

6.       Petroci is a company that is wholly owned by the nation of Cote d'Ivoire, with an

address at PO Box V194, Abidjan Plateau, Cote d'Ivoire. Its business includes distribution of

butane gas. Formed in 1975, Petroci's stated aim is "to make Côte d'Ivoire the hub of trade in

petroleum products for all countries in the sub-region, and even for all of Africa."

7.       Petroci's main objective is to "[b]uild an integrated and diversified oil economy,

by optimizing research efforts and the development of hydrocarbon resources". The main

missions of Petroci are, on the one hand, the research and exploitation of hydrocarbon deposits and, on the other hand, the storage, trade and transport of all petroleum products.

8.      Bamba, at all times relevant herein, was the Director General of Petroci. On information and belief, he is a resident of Cote d'Ivoire. He is named herein in his individual capacity for his own tortious conduct.

9.      At all times relevant herein, Bamba was a primary actor of Petroci as its Director General, and signed the Agreements One and Two, as defined below, which designated the courts or the commercial courts of New York as the exclusive venue for disputes.

10.     Bamba was not merely a corporate employee who played no part in the consummation of Agreements One and Two, but was the person responsible for implementation of the growth and development of Petroci. He took office in August 2021. According to press reports, his active involvement included overseeing the discovery of significant oil and gas deposits, and lists himself on Linkedin as "drilling and production director" at Petroci. He was appointed at the time of Petroci becoming a public company, and it was reported publicly that the change in Petroci's status allowed Bamba greater freedom in negotiating with oil companies.

11.     Bamba led the effort of Petroci to expand its activities in the oil sector in general, and outreach to the United States as a market, as emphasized in a piece published in Petroci Infos No. 30 2022 that:

> Thus, with the aim of revitalizing the activities of the oil sector in general, and Petroci Holding in particular, a delegation went to the invitation of the African Petroleum Producers' Organization (APPO), to fully play its role at the 23rd World Petroleum Congress from December 5 to 9, 2021 at the George R. Brown Convention Center in Houston, United States of America.
>
> But before the meeting on American soil, and together with its supervisory Minister, Petroci Holding has conducted a promotional campaign of the Ivorian sedimentary basin, called RoadShow 2021. This outing in the Arabian Gulf, land of oil, took place in the margins of the international conference Africa Oil Week (AOW), organized by Interfax

Global Energy (ITE), from 5 to 8 November 2021 in Dubai at Madinat Jameirah Hotel. Two outings which on the international level, will allow Petroci Holding to increase its portfolio of partners.

## JURISDICTION,  VENUE AND CHOICE OF LAW

12.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1330(a) because Petroci (1) is a foreign state as defined in The Foreign Sovereign Immunities Act (FSIA) 28 U.S.C. § 1603(a), (2) is an  instrumentality of a foreign state, to wit, Cote d'Ivoire and (3) is not entitled to immunity either under 28 U.S.C. §§ 1605-1607 or any applicable international agreement. Cote d'Ivoire owns 100% of Petroci. Pursuant to the FSIA, 28 U.S.C. § 1605(a)(2), a foreign state is not immune in a case as this where the action is based on a "commercial activity carried on in the United States by the foreign state," namely, contracting with a South Dakota limited liability company located in the State of Maryland.

13.      The Court also has diversity jurisdiction pursuant to 28 U.S.C. § 1332 over based on diversity between ETS MIR, a South Dakota LLC, and two Ivoirian entities (Petroci and Bamba).

14.      Pursuant to 28 U.S.C. § 1602, both the state and federal courts of the United States have jurisdiction over foreign sovereign immunity claims.

15.      On information and belief, Petroci made a presentation as to itself and its future projects in New York City during an Oil and Gas Investment Symposium presented by the Independent Petroleum Association of America (IPAA), evidencing a direct approach for business from the United States, which was made in New York.

16.      On further information and belief,  Bamba has participated in the marketing of Petroci through the IPAA as well as the African Petroleum Producers' Organization (APPO) and the World Petroleum Congress,  and directed such activities to the United States.

ClarkHill\J6768\420293\264720455.v1-11/22/21

17.     Consequently, personal and subject matter jurisdiction, and venue, with regard to Petroci is established pursuant to the agreements between the parties, New York law recognizing the parties' selection of forum and choice of law, the absence of any waiver of removal, and the absence of an adequate and available forum.

18.     Pursuant to N.Y. Gen. Obl. Law § 5-1402, New York courts allow maintenance of an action or proceeding against a foreign state where the action arises out of or relates to any contract, agreement, or undertaking for which a choice of New York law has been made in whole or in part pursuant to Gen. Obl. Law § 5-1401 and the obligation involved is not less than $1,000,000 USD (one million dollars) and in which the foreign corporation or non-resident agree4ds to submit to the jurisdiction of the courts of New York.

19.     There is more than $250,000 (two hundred fifty thousand dollars) at issue in this matter, satisfying the monetary requirement of N.Y. Gen. Obl. Law § 5-1401, and the law supports a finding that New York is the chosen law in the context of Agreements One and Two (defined below), reference to the "laws of the United States," coupled with a designation of forum in New York and the intention not to apply law of Cote d'Ivoire.

20.     Pursuant to 28 U.S.C. § 1330 and § 1608(a), this Court has personal jurisdiction over Petroci because the Agreements One and Two (defined below) provide that "the parties expressly consent to the exclusive jurisdiction of the courts of New York."

21.     At all times relevant herein, personal and subject matter jurisdiction, and venue, with regard to Bamba is also established. Bamba was aware that under Agreements One and Two, Petroci had agreed to the exclusive jurisdiction of the courts of New York. He was aware that ETS MIR was a company doing business in the United States, and that his acts as alleged below were directed towards ETS MIR, were tortious, and he expected or should reasonably

have expected that the acts would have consequences in the United States in general, and with regard to Agreements One and Two designated New York as the chosen and exclusive forum, in that state as well. Pursuant to CPLR § 302, Bamba is subject to personal jurisdiction in New York for personally or through an agent transacting business within New York to supply goods or services within New York.

22.     According to Ivoirian counsel for ETS MIR, Lonan Tuore Inocent, Bamba was properly served under Ivoirian law, and in particular, pursuant to Articles 247, 249 and 250 of the Code of Civil Procedure of Cote d'Ivoire. Pursuant to F.R.C.P. 44.1, and in response to assertions as to Ivoirian practice by Petroci and Bamba, ETS MIR provides notice that it will raise issues under Ivoirian law regarding all points raised in opposition to the complaint as amended, including without limitation Ivoirian law regarding civil procedure.

23.     Pursuant to 28 U.S.C. § 1367, has supplemental jurisdiction over any state law claims and claims against Bamba.

24.     Venue in the United States District Court for the Southern District of New York is therefore proper pursuant 28 U.S.C. § 1391 and NY Gen. Obl. Law § 5-1402 (choice of forum) since the contract between the parties "(a)  is  a   contract, agreement or undertaking, contingent or otherwise, in consideration of, or relating to any obligation arising out of a transaction covering in the aggregate, not less than one million dollars, and (b) which contains a provision or provisions whereby such foreign corporation or non-resident agrees to submit to the jurisdiction of the courts of this state."

25.     There are facts by impartial and well-recognized non-governmental organizations that show that Cote d'Ivoire is not an adequate alternative forum for this dispute.

- 6 -

26.     In its Freedom in the World 2022 Report for Cote d'Ivoire, Freedom House, the non-profit organization founded in 1941, stated that: "The judiciary is not independent, and judges are highly susceptible to external interference and bribes. Processes governing the assignment of cases to judges are opaque. The courts generally adjudicate cases in accordance with the ruling party's political interests, and the judiciary was fully mobilized to support President Ouattara's third term."[1]

27.     Similarly, The World Justice Project ranked Cote d'Ivoire 108 out of 140 countries on its 2022 overall index score, 112 out of 140 for absence of corruption, 76 out of 140 for civil justice, and 119 out of 140 for constraints on government powers.[2]

28.     Finally, but not exhaustively, on the Transparency International's Corruption Perceptions Index, in which 0 is highly corrupt and 100 is very clean, the 2022 rating for Cote d'Ivoire was 37.[3]

29.     To the extent that the law of Cote d'Ivoire may be relevant as to certain issues not covered by New York law, including but not limited to certain tax law issues as noted below, notice is herein given of that pursuant to Rule 44.1 of the Federal Rules of Civil Procedure.

**FACTUAL ALLEGATIONS COMMON TO ALL COUNTS**

30.     On or about November 4, 2021, Etablissement MIR SARL entered into a contract with Petroci for the supplying of 10,000 metric tons plus or minus 10% to be delivered between December 22-24, 2021 (the "November 4 Agreement"). This November 4 Agreement was completed and is not at issue in this case. That company, however, and its address were clearly stated in that contract.

---

[1] https://freedomhouse.org/country/cote-divoire/freedom-world/2022
[2] https://worldjusticeproject.org/rule-of-law-index/country/2022/Cote%20d'Ivoire
[3] https://www.transparency.org/en/cpi/2022/index/civ

31.     The delivery made by Etablissement MIR SARL was limited to a non-renewable contract of 10,000 metric tons. In order to gain larger and longer-term contracts, Coulibaly determined that more resources and international suppliers were required, and decided to form ETS MIR LLC in the United States and base it there.

32.     Thereafter, on or about January 12, 2022, Coulibaly caused to be formed in South Dakota, United States, ETS MIR, LLC, the plaintiff in this action.

33.     The reasons ETS MIR was set up in the United States included the ability to provide a legal avenue for becoming a multinational company that could operate throughout the entire world., as well as for tax reasons. The new entity in the United States  was set up to sign agreements with U.S.-based oil and gas companies, and to comply with international standards and regulations, and was seen to benefit ETS MIR's reputation.

34.     Petroci holds itself out a leader in the sale and distribution of LPG Butane in Cote d'Ivoire. As part of its and Bamba's goal of revitalizing the activities of the oil sector in general, and Petroci in particular, in December 2021 Petroci sent a delegation to the 23rd World Petroleum Congress in Houston, Texas, United States, which Bamba attended as part of his initiative to move Petroci into global markets.

35.     On or about February 14, 2022, ETS MIR and Petroci entered into two new agreements, with ETS MIR as seller and Petroci as buyer, for the provision of set amounts of metric tons of LPG Butane. One contract ("Agreement One") stated that ETS MIR was to provide 75,000 metric tons, plus or minutes 10%, to be delivered from January 1, 2022 to December 31, 2022. The second contract ("Agreement Two") provided for 100,000 metric tons to be delivered from January 1, 2023 to December 31, 2023, plus or minus 10%, and an

ClarkHill\J6768\420293\264720455.v1-11/22/21

additional 100,000 metric tons, plus or minuses 10%, to be delivered from January 1, 2024 to December 31, 2024 (collectively "Agreements One and Two.")

36.     For both Agreements One and Two, a detailed formula for payment was set forth for determination of the price, based upon "Platt's LP Gaswire under the heading European LPG Butane FOB NWE Seagoing" plus a differential of USD $79 per metric ton VAC, with market conditions determining the final invoice price. Both Agreements One and Two contained the same quality criteria for the LPG Butane to be provided, and both Agreements One and Two established themselves to serve as the purchase orders.

37.     Under Agreements One and Two, and applying the formulas, the United States entity, ETS MIR anticipated that the total amount of sales would be approximately $800,000,000 USD for the terms of both of the Agreements. This was based on an average price of $1300 USD /metric ton. The invoice price offered by ETS MIR was less than other companies selling to Petroci for the same period.

38.     Agreement One took effect by its terms January 1, 2022 and had a one year term. Agreement Two provided a two year term, "renewable by tacit agreement" with increased volume requirements, unless rejected in writing on eight months' notice, with an effective date of January 1, 2023 and continuing to December 31, 2024.

39.     Both Agreements One and Two provided for the appointment of an independent international inspector to ascertain the quality of the samples of the LPG Butane from the shipment on each vessel. SGS Code d'Ivoire S.A. was appointed as the individual inspector.

40.     Both Agreements One and Two expressly showed the address for ETS MIR to be "Etablissement Mir, 25 First Ave. SW St. A Watertown, SD 57201 USA" on page 2, and page 2

of both Agreements One and Two were initialed by both parties. ETS MIR's name and address were clearly stated and shown.

41.     The address of Etablissement MIR SARL in the November 4 Agreement was shown as "Etablissement MIR, 01 BP 16f Abidjan, Cocody 2 Plateaux." Consequently, the change in location of ETS MIR was obvious and transparent, as was the name, and at no time was there a question by Petroci to ETS MIR with regard to the address in the United States.

42.     In addition, Agreement One contained the specification of the laws of the United States and the "exclusive jurisdiction of the commercial courts of New York" and Agreement Two contained the specification of the laws of the United States and the "exclusive jurisdiction of the courts of New York." The original French contained the adjective "commercial" in Agreement One but not in Agreement Two, and the word "tribunal" in both Agreements One and Two is singular, not plural. Both the federal and state courts located in New York handle commercial matters.

43.     Bamba's signature on behalf of Petroci appears on both Agreements One and Two on the same page as these provisions relating to choice of law and venue, and were or should have been obvious to him as the person signing. Nonetheless, at no time did Bamba or anyone else from Petroci question or object to Article 15 as it was written in French in both Agreements One and Two, and Petroci's own filed exhibits show Bamba's signature and Petroci's stamp.

44.     On information and belief, Agreements One and Two were drafted by Petroci's legal department and three of its officers, namely, Yao Ndri Frederic (Petroci Director of Commercial Contracts Department), Francis Comoe (Director of Petroleum Products Trading), Laurent Ligue (Vice-Director of Commercial Contracts Department) and Vamissa Bamba (General Director of Petroci).

ClarkHill\J6768\420293\264720455.v1-11/22/21

45.     On further information and belief, Bamba wrote to the Minister of Energy and acknowledged that Agreements One and Two were signed by ETS MIR, the United States entity, and were ready and awaiting signature by Biamary Coulibaly.

46.     Petroci is a state-owned company and on information and belief, under the practice in Cote d'Ivoire, would have had such documents reviewed  by its legal department prior to execution.

47.     All departments assigned to work on contracts were involved and aware of ETS MIR as being an entity formed in the United States. For example, during the exchange of drafts, Yao Ndri Frederic, Director of commercial Contracts department sent an email to ETS MIR, which on information and belief was sent upon advice of Petroci's legal counsel, to change the venue to France. This led to an in person meeting in which ETS MIR explained why it could not do that. Emails dated February 7 and 8, 2022 were sent by Frederic on behalf of Petroci and attached a draft of Agreement Two, which showed a proposed deletion of "the United States of America" in French and replacement of that with France, and a deletion of "New York" and replacement with the Paris courts. The version sent back by ETS MIR on or about March 9, 2022 has an additional article that addressed best efforts to effectuate a settlement (a new proposed Article 15) and a reinstatement of the law of the United States and the courts of New York.

48.     Ultimately, the  proposed article regarding best efforts at settlement was not included in the final signed draft, and the change back to United States law and the venue in New York was made.

49.     Consequently, the final Agreements One and Two as signed went through a process of negotiation and drafting, with in person meetings, and the full awareness of Petroci personnel charged with reviewing such agreements.

- 11 -

50. The name ETS MIR and its address in the United States were also reflected on the invoices it sent to Petroci, and Petroci confirmed its acceptance of those and acknowledgement of the entity in the United States by sending wire transfers to the ETS MIR LLC bank account at Bank of America in New York, New York, in the United States. In addition to the forum selection clause designation, New York was also the situs for a significant payment of $13,632,526.85 payment in furtherance of Agreements One and Two.

51. ETS MIR understood and expected that the legal department (now understood to be headed by Yannick Bery) would have reviewed two contracts obligated an agency of the government to commitments in the millions of dollars.

52. The title page of each contract shows ETS MIR, not Etablissement MIR or Etablissement MIR SARL, and the preamble shows ETS MIR. The address is also plainly shown as in Watertown, South Dakota, following ETS MIR's trade name.

53. The dispute resolution clause was drafted in its final form to accommodate the United States as the venue for dispute resolution, since two Cote d'Ivoire companies could not choose a United States venue for that purpose, and this was known to Petroci. As no time was objection made to Article 15 of Agreements One and Two prior to signature by Petroci.

54. Notably, the stamp used in Agreements One and Two is by the United States entity, ETS MIR, and shows "USA" in the circle, with the words "ETS MIR Trading" surrounding it; it does not show "Cote d'Ivoire" or "Ivory Coast" so as to indicate the other separate entity, Etablissement MIR SARL, the separate company with which Petroci had a prior contract. This stamp is adjacent to Petroci's stamp, which was signed by Bamba Vamissa, Petroci's director, so was obvious.

ClarkHill\J6768\420293\264720455.v1-11/22/21

55.     On February 14, 2022, Petroci provided ETS MIR with a Butane Delivery Plan for 2022 that identified cargo numbers, quantity and laycan dates that provided for the delivery of the cargo. ETS MIR immediately commenced its activities in fulfillment of its obligations under the Agreements, and began discussions with its suppliers. One delivery was made on April 4, 2022 for 12,000 metric tons for which ETS MIR was paid.

56.     Before ETS MIR could complete its obligations under the Agreements, Petroci purported to terminate the Agreements. On or about June 3, 2022, it sent a letter to ETS MIR stating that it has been contacted by "the Ivorian tax authorities to report your irregular tax situation," and asserted that this precluded ETS MIR's ability to perform under the Agreements, and claimed, without providing any documentation or other factual support, that ETS MIR's commercial due diligence was "unreliable," and stated that it "has decided to terminate the above-mentioned contractual relations with immediate effect."

57.     No documentation or further information was provided to ETS MIR by Petroci to corroborate such claims, despite demand.

58.     The contentions in the June 3, 2022 letter were false as a legal and factual matter. Given that ETS MIR was established just four months earlier, and that a limited liability company in the United States pays no income taxes, which income is passed to its members who then report and pay tax in the subsequent calendar year (2023) for 2022, the claim as set forth in the June 3, 2022 letter made no legal or factual sense. No specifics were identified.

59.     The language of Agreements One and Two themselves places the obligation for payment of all taxes, duties or fees applied on liquefied petroleum gas or cargo, on Petroci, and not on ETS MIR. Furthermore, a limited liability company formed in a state in the United States does not itself pay taxes; it is a pass-through entity that files a business tax information form but

- 13 -

only the owners themselves pay taxes. Since ETS MIR was first formed in the United States on January 12, 2022 and the Petroci termination letter was sent on or about June 3, 2022, less than six months later, there would not even have been a return filed at all by anyone related to ETS MIR, demonstrating the bogus nature of the claim of tax irregularity. The reliance on a purported failure to pay taxes within months of the execution of the Agreements and in the same year as formation of ETS MIR was therefore fictitious and not a valid reason for termination of Agreements One and Two.

60.     Etablissement MIR SARL, based in Cote D'Ivoire had no issues with the tax department in Cote d'Ivoire. The taxes of the year 2022 are payable from April 2023 to June 2023.

61.     The false nature of the claim of tax irregularity was corroborated by the Ivoirian government itself. Later investigation confirmed the correctness of the ETS MIR position and refuted the sole asserted basis for the termination of Agreements One and Two. On or about February 8, 2023 an Interpellative Summons, used in civil law comparable to a subpoena in the United States to gain information, was served on the Director of Investigations of the General Directorate of Taxes to request an answer to the question posed in French, and translated here: Did his department declare to Petroci holding that the company ETS MIR LLC had an irregular tax situation?" The response received from the General Directorate of Taxes as translated here was: "We are not aware of the existence of the company ETS MIR LLC."

62.     The second question asked in French, and translated here, was: "Did his department induce or instruct Petroci holding to break the supply contract it had with ETS MIR LLC?" The answer from the General Directorate of Taxes as translated here was: "No, we cannot make such a recommendation on a contract that we do not know exists."

- 14 -

63.     Petroci never provided any document or report received from the General

Directorate of Taxes claiming that Etablissement MIR SARL had tax irregularities. More to the

point, Etablissement MIR SARL, the separate company, itself never received any such report of

regularities from the General Directorate of Taxes. Petroci never provided any opportunity to

ETS MIR to respond; it simply terminated Agreements One and Two based on false claims, with

no documentation. It is motion to dismiss, it still does not provide any document from the

General Directorate of Taxes to corroborate its claim.

64.     Consequently, the statement in the June 3, 2022 letter from Bamba on behalf of

Petroci to ETS MIR that Petroci was contacted by the Ivorian tax investigation department to

report ETS MIR's "irregular tax situation, which does not allow you to perform the serve for

which our parties have agreed . . . " was false.

65.     On June 9, 2022, ETS MIR through Ivorian counsel disputed the claims and

rejected the purported termination of Agreements One and Two.

66.     On or about June 10, 2022, a meeting occurred between representatives  of

Petroci and ETS MIR, at which time Petroci through its chief executive officer, Bamba, said

there had been a "misunderstanding" and agreed to re-sign Agreements One and Two and negate

the purported termination.

67.     Following that, on June 16, 2022, Petroci sent a Butane Delivery Plan for one

cargo number. This was not the same as the previously agreed-upon Butane Delivery Plan

established on February 14, 2022 at the time of Agreements One and Two.

68.     Agreement One called for order quantity of 75,000 metric tons plus/minus 10%

for the calendar year 2022. The February 14, 2022 Butane Delivery Plan called for that 75,000

metric ton plus/minus 10% amounts. The June 16, 2022 Butane Delivery Plan reduced that

amount dramatically, to 11,000 plus/minus 10% as the only delivery in 2022, in direct violation of Agreement One.

69.     Meanwhile, the purported termination of June 3, 2022 had not been formally confirmed as withdrawn, and Agreements One and Two were not re-signed or reinstated. ETS MIR confirmed  it could not make a July delivery as a result of the confusion and purported termination, and absence of technical, legal and contractual bases to ensure delivery in July, and the short time for setting up operational provisions of the July delivery. Consequently, ETS MIR rejected this new Butane Delivery Plan and ETS MIR remained unable to perform under the Agreements until Petroci took the corrective steps it had promised to do.

70.     By email dated June 16, 2022, ETS MIR told Petroci that cargo was already scheduled to arrive during the interval of July 15-20, 2022, and that a change of the date to August 24, as the June 16, 2022 Butane Delivery Plan called for, would expose ETS MIR to demurrage charges of more than one month, and asked that the delivery program be reviewed.

71.     On or about  June 23, 2022 , ETS MIR sent a follow email to Bamba, the Director General of Petroci, in order to sign the new agreement as promised two weeks earlier. On or about July 23, 2022. the Bamba replied to ETS MIR to reassure it that the agreements would be re-signed as promised, but he again failed to do so.

72.     In sum, after acknowledging its mistake, Petroci did not re-sign the original Agreements One and Two or reinstate them, but instead submitted a modified version of those Agreements. ETS MIR noticed this and asked Petroci to reinstate and/or re-sign the original Agreements One and Two as they were. ETS MIR was ready willing and able to meet the original targets but because of absence of the reinstated Agreements One and Two with the corrected terms, ETS MIR could not proceed.

ClarkHill\J6768\420293\264720455.v1-11/22/21

73.     On or about June 27, 2022, an ETS MIR representative sent an email in response to the head of Operations and Shipping Desk to decline to delivery in the absence of re-signed Agreements or formal and confirmed negation of the purported termination. ETS MIR specifically advised of this and again asked that the "terminated" contract be re-signed. On July 23, 2022, Petroci confirmed by email that it had "noted" ETS MIR's "concerns," and "assure[d]" ETS MIR "that everything will be done to ensure that the contracts are made available on the right date." Once again, this failed to occur.

74.     ETS MIR never acknowledged the legality of the purported termination of Agreements One and Two. Despite demanding that Petroci reinstate Agreements One and Two pursuant to its promise to do so, Agreements One and Two were not reinstated or re-signed.

75.     For the period February to August 2022, ETS MIR lost approximately $90,000,000 USD (ninety million dollars) in sales, and lost one of its major suppliers as a result of the wrongful termination of the Agreements to another entity related to Petroci and managed by Brakissa Bamba, the vice director of Petroci.

76.     On information and belief, the purported termination of Agreements One and Two was politically motivated, without legal basis, and in reliance upon non-existent claims of tax irregularities.

77.     At present, the Petroci is not purchasing from ETS MIR in accordance with Agreements One and Two, thereby damaging ETS MIR. No other companies will deal with ETS MIR because of the ats of Petroci, because such companies in the field do not want to have repercussions from Petroci. As a consequence, ETS MIR continues to be damaged.

**FIRST CAUSE OF ACTION-BREACH OF CONTRACT (PETROCI)**

78.     ETS MIR realleges its allegations made in Paragraphs 1-74 as though realleged herein in their entirety.

79.     The Agreements One and Two call for the sale of goods, namely, butane, and therefore the transaction at issue involves the sale of goods.

80.     Petroci's purported termination and attribution of sales to other companies constitute breach of contract, damaging ETS MIR and entitling ETS MIR to all remedies afforded to damaged sellers under the New York Uniform Commercial Code.

81.     There is also a sum due of $63,518.63 USD in late fees.

82.     To the extent that Agreements One and Two purport to contain limitations of damages provisions in Article 9, enforcement of same causes Agreements One and Two to fail of their essential purposes, and ETS MIR is therefore entitled to all available remedies under the New York Uniform Commercial Code and other applicable law.

## SECOND CAUSE OF ACTION-ANTICIPATORY BREACH OF CONTRACT (PETROCI)

83.     ETS MIR realleges its allegations made in Paragraphs 1-82 as though realleged herein in their entirety.

84.     The acts of Petroci constitute anticipatory breach of contract by performing acts that substantially impaired the value of the Agreements to ETS MIR, damaging ETS MIR.

## THIRD CAUSE OF ACTION-COLLATERAL ESTOPPEL (PETROCI)

85.     ETS MIR realleges its allegations made in Paragraphs 1-84 as though realleged herein in their entirety.

86.     The acts of Petroci constitute collateral estoppel, in that Petroci has purported to terminate Agreements One and Two, agreed to re-sign or reinstate Agreements One and Two,

and has failed to do so, despite making a clear and unambiguous promise on or about June 10, 2022 to do so.

87.    In addition, in August 2022, the legal officer of Petroci sent an email to ETS MIR's representative confirming this intention to re-sign Agreements One and Two that Petroci purportedly terminated.

## FOURTH CAUSE OF ACTION-BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEAL ING (PETROCI)

88.    ETS MIR realleges its allegations made in Paragraphs 1-87 as though realleged herein in their entirety.

89.    All contracts under applicable law and the New York Uniform Commercial Code impose a duty of good faith and fair dealing in the performance of the contracts.

90.    This duty good faith and fair dealing covenant embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract; where the contract contemplates the exercise of discretion, that pledge includes a promise not to act arbitrarily or irrationally in exercising that discretion.

91.    ETS MIR was formed with an effective date of January 2022, and entered into the Agreements in February 2022. It performed and made the one sale in April 2022. Immediately after making those sales to Petroci, Petroci sent a bogus termination letter. It was bogus because its purported reliance on tax issues had not basis in law, and was timed immediately after two sales had been made.

92.    Petroci also attempted to extort signature by ETS MIR on revised documents to replace the terminated Agreements One and Two by wrongfully withholding payment on the delivery made by ETS MIR through Africa Commodities, a non-party to which ETS MIR sold

butane for ultimately delivery to Petroci. Petroci, and on information and belief at the direction of Bamba, initially refused to pay Africa Commodities so that ETS MIR could be paid, if ETS MIR did not sign the new and less favorable proposed agreements. Ultimately the invoice was paid without ETS MIR having to sign, through the intervention of the Minister of Mines and Energies, and though the invoice was paid the late fee remains unpaid.

93.     In fact, Petroci continued to act in contradictory fashion, permitting the indirect transaction with ETS but refusing to deal with it directly, and further attempting to extort a new agreement from ETS MIR:

> We are following up on your e-mail of January 22, 2023 concerning the request for delivery of Butane Gas for the period from February 17 to 19, 2023 to the company PETROCI HOLDING made on January 10, 2023 by mistake.
> Indeed, our trading platform had not recorded the litigation in progress between your company ETS MIR LLC, and the company PETROCI HOLDING.
> We would be grateful if you could consider the order of last January 10th as null and void insofar as PETROCI HOLDING has terminated all contractual links with your companies since June 3rd 2022.

94.     On information and belief, the extraneous acts of Petroci, without providing any supporting back up either factually or legally, was part of a premeditated plan to avoid its contractual responsibilities and destroy or injure the rights of ETS MIR to the benefit of Agreements One and Two, damaging ETS MIR.

95.     In addition, Petroci threatened Africa Commodities with their own contract termination if they continued to do business with ETS MIR.

### FIFTH CAUSE OF ACTION-SPECIFIC PERFORMANCE (PETROCI)

96.     ETS MIR realleges its allegations made in Paragraphs 1-95 as though realleged herein in their entirety.

97.     As an alternative to an award of monetary damages, the Court has discretion to direct enforcement of Agreements One and Two.

98.     Here, (1) Agreements One and Two have been pleaded along with the making of the contracts and their terms, including a description of the subject matter; (2) ETS MIR is and remains ready, willing, and able to perform the Agreements and has fulfilled all of its duties to date; (3) it is within Petroci's power to perform the purchase agreement, and (4) that there is no adequate remedy at law.

99.     Monetary damages are insufficient to restore ETS MIR's reputation and position it he marketplace, and if the refusal to honor the Agreements One and Two continues, ETS MIR faces permanent loss of business.

### SIXTH CAUSE OF ACTION-DEFAMATION (PETROCI AND BAMBA)

100.    ETS MIR realleges its allegations made in Paragraphs 1-99 as though realleged herein in their entirety.

101.    As alleged above, the claim by Petroci that it had been contacted by "the Ivorian tax authorities to report your [ETS MIR] irregular tax situation" was false at the time it was made, Petroci knew it to be false, has not produced a single document to corroborate that claim despite demand, and the assertion has been proven false by the responses of the Director of Investigations of the General Directorate of Taxes that have denied ever hearing of ETS MIR.

102.    The sole announced rationale by Petroci for its wrongful termination of Agreements One and Two was this purported, and false, claim of tax irregularity.

103.    On information and belief, Bamba, acting both individually and as an officer of Petroci, communicated the false claim of tax irregularity to Africa Commodities, and threatened

Africa Commodities with their own contract termination if they continued to do business with
ETS MIR.

104.     On information and belief, as a result, Africa Commodities now does business
with other entities that are competitors of ETS MIR.

105.     On information and belief, Bamba, acting both individually and as an officer of
Petroci, told other companies, whose identifies are not fully known, to do business with Petroci.

106.     On information and belief, Bamba repeated the false statement about tax
irregularities to the regional director of tax administration and various Ivoirian politicians,
including the minister of mines and energy, about the alleged tax irregularities of ETS MIR.

107.     The allegation of tax irregularities is a statement that tends to injure another in its
trade, business or profession, ETS MIR, was published without privilege or authorization to a
third party, was negligently or intentionally made, and damaged ETS MIR in its business and
trade and reputation, constituting defamation per se.

108.     Petroci did not timely challenge personal jurisdiction as required under F.R.C.P.
12(b) and as such, has waived objections. Consequently, the New York long arm statute, CPLR
302, is inapplicable to Petroci.

109.     The acts of Bamba as a primary actor of Petroci are intertwined in the acts of
Petroci in connection with Agreements One and Two. Bamba was the primary actor of Petroci in
authorizing the use of a New York-venued bank, Bank of America, for a significant payment in
excess of $13,000,000 to implement Agreements One and Two. The agreement with an
American-based company, even if owned by an Ivoirian, was part of the targeting of the United
States for business for Petroci that Bamba engineered, and his visit to Houston to promote
Petroci is evidence of that.

110.     Alternatively, if not qualifying as defamation *per se,* the above conduct qualifies as defamation *per quod,* damaging ETS MIR.

111.     Under NY CPLR § 302(a)(1), a non-domiciliary who contracts anywhere to supply goods or services in New York is subject to personal jurisdiction. Bamba, as a primary actor of Petroci, and in implementing his policy of expanding Petroci's business in the United States, of which New York was an essential part as demonstrated by the inclusion of New York as the designated forum, and the use of a New York-situated bank for payment in connection with the business relationship between Petroci and ETS MIR made it foreseeable that Bamba could be sued in the United States in general and New York in particular for acts performed regarding Agreements One and Two. Petroci acted as Bamba's agent in the United States in general and in New York in particular through its choice of venue but also through its participation in the financing of a significant purchase as part of the overall plan embodied in Agreements One and Two.

### SEVENTH CAUSE OF ACTION-TRADE LIBEL (PETROCI AND BAMBA)

112.     ETS MIR realleges its allegations made in Paragraphs 1-111 as though realleged herein in their entirety.

113.     Bamba, acting both individually and as an officer of Petroci, knew or should have known the claims of tax irregularity by ETS MIR were false and unsubstantiated, yet with malice, communicated such assertions to third parties, including Africa Commodities, the regional director of tax administration, and the minister of mines and energy, thereby disparaging the services offered by ETS MIR and damaging ETS MIR.

### EIGHTH CAUSE OF ACTON—INTENTIONAL INTERFERENCE WITH  CONTRACT (BAMBA)

ClarkHill\J6768\420293\264720455.v1-11/22/21

114.    ETS MIR realleges its allegations made in Paragraphs 1-113 as though realleged herein in their entirety.

115.    Since the filing of the First Amended Complaint on March 23, 2023, BAMBA was suspended as director general of Petroci on or about May 4, 2023 as a result of an audit of Petroci. A press report in Abidjan.net stated:

> The Board of Directors of PETROCI Holding wishes to inform national and international opinion that as part of the audit missions within the company which began at the end of June 2022 and which are continuing, it was decided during its extraordinary session of Thursday May 04, 2023, the suspension of Mr. Vamissa Bamba from the position of General Manager. To this end, Ms Melaine Koné, technical advisor to the Ministry of Mines, Petroleum and Energy, has been appointed interim Managing Director.

116.    In his declaration submitted to the Court on July 6, 2023, this was not mentioned; Bamba simply stated that "I am employed as Director General of Petroci Holding, the national oil company of The Republic of Cote d'Ivoire." He did not mention either the suspension, the audit, nor the appointment of an interim managing director.

117.    Regardless, on July 18, 2023, after the filing of his declaration in which he asserted he was an employee of Petroci, Bamba was terminated from employment with Petroci, and Fatoumata M'Balou Sanogo, appointed as managing director of Petroci.

118.    During Bamba's tenure, in August 2022, over 17,000 tons of butane gas went missing, according to news reports, resulting in the audit. The auding firm, appointed on June 21, 2022, was to assess "the process of supplying and distributing butane gas to Petroci," as reported in *Afrik Soir*. A press report at the time indicated the value at 9 billion West African CFA francs, or approximately $16,781,900 USD at present.

119.    This supply and distribution of butane gas was exactly the business that is the subject of Agreements One and Two, and the relationship between ETS MIR and Petroci. As the director general of Petroci,

ClarkHill\J6768\420293\264720455.v1-11/22/21

120.    As reported in Afrique on May 30, 2023 in *Afrique:*

En effet, selon les résultats des audits dont le premier rapport, à en croire nos sources, est sur la table du Président de la République, le dossier Vamissa Bamba révèle une affaire de gros sous.

Le DG suspendu, nous confie-t-on sur le rapport de l'audit, jouissait de la rondelette somme d'un milliard de F Cfa comme fonds de souveraineté.

Translated (DeepL.com):

In fact, according to the results of the audits, the first report of which, according to our sources, is on the table of the President of the Republic, the Vamissa Bamba case reveals an affair of big money.

According to the audit report, the suspended CEO enjoyed the tidy sum of one billion F Cfa as a sovereign wealth fund.

121.    Since the suspension of Bamba, Plaintiff has been in communication in Côte d'Ivoire with the Ministry of Energy and has learned that Bamba assigned the various contract rights previously held by ETS MIR to other entities. As such, on information and belief, Bamba personally deprived ETS MIR the benefit of its bargain in existing Agreements One and Two.

122.    On May 7, 2023, *Afrik Soir* reported that there are now several audits as to the missing butane, and certain allegations have been made against Bamba that had direct impact on ETS MIR and its contract. In particular:

Among other things, it is attributed to Vamissa Bamba, the presumed sale of places at the level of the programming of ships which dock to deliver gas. More incriminating facts relate to the creation of demurrage which cost billions of CFA francs to Petroci, but whose accounting records are inaccessible to auditors who suspect an intelligence with certain companies. 'The same practice involves late payment penalties that were growing and costing the company hundreds of millions of dollars,' says our source.

Another incriminating element, a deal with a private company that delivers gas at the same time, instead of partners under contract with Petroci. More seriously, our sources reveal, while the audit is taking place, the same practices continue. Thus, on Friday May 5, 2023, the very day after the suspension decision taken by the CA, the unscheduled company Augu8sta continued to deliver gas instead of the company SARA, which threatens to seize the minister if it fails to deliver on time.

ClarkHill\J6768\420293\264720455.v1-11/22/21

*      *      *

Another element in charge, a deal with the company a company called Augusta which delivers gas at the same time, instead of partners in contract with Petroci. To this company, Augusta still sells crude from the Ivory Coast in an over-the-counter contract without the agreement of the supervisory authority.

123.   ETS MIR also learned from a representative of the Ministry of Energy that Bamba sold the ETS MIR Agreements One and Two to Augusta on or about September 12, 2022 in secret.

124.   On information and belief, Bamba also threatened Africa Commodities with termination of its contract with Petroci if it continued to work with ETS MIR.

125.   Consequently, ETS MIR was a party to valid contracts with Petroci, (2) Bamba knew of those contracts, (3) Bamba intentionally procured Petroci's breach of those contracts without justification, (4) involved a payment through a New York bank that was integral to Agreements One and Two, (5) which constituted  actual breach of the contracts, and (6) damaged ETS MIR. These acts were performed while Bamba was a primary actor of Petroci, and intertwined with Agreements One and Two that contain a forum selection clause that designates the courts or the commercial courts of New York as the exclusive venue for disputes.

126.   Bamba is liable for his individual acts since he has been motivated by malice and acted outside the scope of his corporate representative capacities and induced breach of contract by Petroci. Furthermore, and on information and belief, he was motivated by his personal gain rather than gain for the corporation.

### NINTH CAUSE OF ACTON—FIDUCIARY DUTY (BAMBA)

127.   ETS MIR realleges its allegations made in Paragraphs 1-126 as though realleged herein in their entirety.

- 26 -

128.    Petroci, as the national oil company of Cote d'Ivoire, a sovereign nation, was obligated to adhere to the legal and regulatory provisions of Cote d'Ivoire, and its authorization to import butane gas was subject to that.

129.    Bamba was not just an officer of Petroci, but was a government official in charge of a public agency of the government of Cote d'Ivoire.

130.    Agreements One and Two contained specifically identifiable contract rights that were unique to ETS MIR. ETS MIR anticipated and expected that the value of Agreements One and Two, if fully complied with, had value of approximately $92,000,000.

131.    On information and belief as contained in recent reports and the suspension of Bamba, it has come to light that a significant amount of butane has gone missing, that Bamba caused the contract rights of ETS Mir to be transferred to other entities and directly participated in those transactions, and that Bamba as retained certain funds for himself.

132.    As the Director General of a state-owned agency, Bamba held a fiduciary relationship with Petroci and its conduct with its private contract partners who were creditors of Petroci by virtue of their contracts with it, and is therefore liable for his individual misconduct that has damaged ETS MIR.

133.    These acts constitute a direct breach of a fiduciary duty by Bamba, or alternatively, aiding and abetting a breach of fiduciary duty by Petroci to its creditors through the unaccounted for disappearance of 17,000 tons of butane and the reassignment of ETS MIR's valid contract rights.

**WHEREFORE,** ETS MIR LLC demands judgment against Petroci as follows:

1.    For specific performance reinstating and enforcing Agreements One and Two, and ordering  injunctive relief as necessary to enforce and maintain same;

2. Alternatively, and to make up for past amounts lost, for money damages for breach of contract, including late fees, together with all other damages and remedies permitted under the New York Uniform Commercial Code;

3. For all pre-judgment interest and attorney's fees as may be allowed under law;

4. For judgment against both Bamba individually and Petroci for damages and injunctive relief to preclude further dissemination of the false assertion regarding tax irregularities; and

5. For such other relief as the Court deems appropriate.

Dated: July 26, 2023     CLARK HILL PLC

            */s/ /Steven M. Richman/*
            Steven M. Richman, Esq.
            Clark Hill PLC
            830 Third Avenue
            Suite 200
            New York, NY 10022

            210 Carnegie Center, Suite 102
            Princeton, NJ 08540
            Phone: (609) 785-2911
            Fax: (609) 785-2971
            Email: srichman@clarkhill.com
            Counsel for Defendant ETS MIR LLC

ClarkHill\J6768\420293\264720455.v1-11/22/21

## JURY DEMAND

ETS MIR LLC demands a trial by jury on all issues so triable.

Dated: July 26, 2023                              CLARK HILL PLC

*/s/ /Steven M. Richman/*
Steven M. Richman, Esq.
Clark Hill PLC
830 Third Avenue
Suite 200
New York, NY 10022

210 Carnegie Center, Suite 102
Princeton, NJ 08540
Phone: (609) 785-2911
Fax: (609) 785-2971
Email: srichman@clarkhill.com
Counsel for Plaintiff ETS MIR LLC

ClarkHill\J6768\420293\264720455.v1-11/22/21

## CERTIFICATE OF SERVICE

I certify that on July 26, 2023 I caused a copy of this Amended Complaint to be served upon all counsel of record through filing through the ECF filing system.

_s/Steven M. Richman_

Steven M. Richman

ClarkHill\J6768\420293\264720455.v1-11/22/21